## John W. Canon v. The State.

### No. 450.    Decided March 23, 1910.

### Rehearing denied May 18, 1910.

**1.—Murder—Change of Venue—Practice on Appeal—Bill of Exceptions.**

Where, upon appeal from a conviction of murder, the statement of facts in regard to the change of venue was not made a part of any of the bills of exception or included therein, the same could not be considered under article 621, White's Annotated Code Criminal Procedure, the same not having been made and filed during the term of the court.

**2.—Same—Conduct of Trial—Handcuffs.**

Where, upon appeal from a conviction of murder, it appeared from the record that the complaint that defendant had been brought into court handcuffed was not called to the attention of the court at the time but was urged for the first time in defendant's motion for new trial, the matter came too late and could not be considered; besides the matter was not of sufficient importance, as it actually transpired to cause a reversal.

**3.—Same—Jury and Jury Law—Peremptory Challenges.**

Where, upon trial of murder, the rulings of the court with reference to the manner of questioning jurors were in accord with the decisions of this court and the jurors were in fact not disqualified, there was no error; besides the bill of exceptions on appeal did not show that any of the jurors objected to sat upon the trial, or that defendant was required to exhaust his peremptory challenges on them.

**4.—Same—Evidence—Bill of Exceptions—Limiting Testimony.**

Where, upon appeal from a conviction of murder, the bill of exceptions did not show the testimony objected to, the court's failure to limit said testimony could not be considered; besides no such limitation was required.

**5.—Same—Evidence—Motive.**

Where, upon trial of murder, the court admitted testimony to show that defendant was indicted for the theft of an animal belonging to the deceased, and which testimony the court limited to the question of motive, there was no error.

**6.—Same—Evidence—Physical Appearance of Defendant—Shorthand Facts.**

Upon trial for murder, there was no error in admitting testimony to show that the defendant was excited after the commission of the homicide. This was a shorthand rendering of the facts.

**7.—Same—Evidence—Clothes of Deceased—Position of Parties.**

Upon trial of murder there was no error in admitting in evidence the clothes of the deceased that he wore at the time of the homicide, as well as other articles connected with the homicide, such as empty cartridge shells, etc.,

to show the character of the wounds on the deceased. and explain the position of parties at the time of the homicide.

**8.—Same—Evidence—Bill of Exceptions—Practice on Appeal.**

Where, upon appeal from a conviction of murder, the record showed that the testimony which defendant offered and to which the State objected, was finally all admitted in evidence, there was no error.

**9.—Same—Evidence—Character of Deceased.**

Where, upon trial of murder, defendant had introduced in evidence the threats by deceased against defendant to take his life, there was no error in permitting the State to introduce testimony of the general reputation of the deceased for peace and quietude. Following Jirou v. State, 53 Texas Crim. Rep., 18, and other cases.

**10.—Same—Evidence—Confession.**

On trial of murder, there was no error in admitting in evidence the written confessions of defendant which were made in jail voluntarily and conformed to law.

**11.—Same—Charge of Court—Clothes of Deceased—Limiting Testimony.**

Upon trial of murder, there was no error in admitting in evidence the clothing of deceased and other articles to show the position of the parties at the time of the homicide, and there was no error in the court's failure to limit the same.

**12.—Same—Charge of Court—Manslaughter.**

Where, upon trial of murder, the testimony of the State showed a lying in wait and antecedent preparations and all the indicia of murder, and that of the defendant, a case of self-defense, there was no error in the court's failure to charge on manslaughter.

**13.—Same—Charge of Court—Singling out Facts.**

Upon trial of murder, the court was not required to single out particular facts for the defense and charge the jury with reference to same.

Appeal from the District Court of Polk. Tried below before the Hon. L. B. Hightower.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*F. Campbell,* for appellant.—On question of bill of exceptions and statement of facts on motion to change venue: Cahn v. State, 27 Texas Crim. App., 727, 11 S. W. Rep., 723.

*John A. Mobley,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the first degree, his punishment being assessed at death.

About 6 o'clock on the evening of the 28th of November, 1908, appellant shot and killed Warren Perryman. There were no eyewitnesses to the homicide except appellant. The State's case was one of circumstantial evidence except that in rebuttal appellant's written confession was admitted as evidence. In making out the case in chief the State relied upon circumstances exclusively. Appellant took the

stand in his own behalf and admitted the killing, but under circumstances showing a clear case of self-defense. The evidence for the State in chief shows that appellant and deceased lived close neighbors, both negroes, and both in the employ of a large lumber company. It is also shown there was ill feeling between the parties growing largely out of a prosecution of appellant for cattle theft. The indictment charging that offense alleged the ownership in deceased, and it is further shown in the evidence that deceased was a very important witness in that case, and further that appellant was anxious that he should not appear against him in the case. Threats were also introduced by the State made by appellant against deceased. There were other circumstances detailed before the jury with reference to the relation of the parties to each other, and threats made by one against the other. On the evening of the homicide, about 6 o'clock, the report of three gun shots were heard at the point where it was subsequently shown deceased was slain. The State introduced many circumstances to connect appellant with the homicide: evidence of tracks, the condition of the ground, gun shot shells, the clothes worn by deceased, a sack containing flour deceased was carrying from a nearby store to his residence, the position occupied by the parties, as shown by the wounds on the body of deceased, that a shotgun wad and also a shot were sifted from the flour taken from the sack supposed to have been carried by deceased, which corresponded with the State's theory that appellant was lying in wait, and shot deceased unawares, all of which were introduced by the State. It was further contended by the State that nearby where the killing occurred was a little grove of myrtle bushes from which appellant fired the shots. It was also shown by the State that after the homicide the body of deceased was dragged from the place of the homicide by a circuitous route, into a small ravine entering into a creek, at which point the body was partially covered. Circumstancess were introduced to show that appellant had tied a rope around the feet of deceased, and fastened the other end of the rope to the horn of the saddle and by this means did the dragging. Appellant's gun was found in one of the houses on his place recently discharged. This was the morning following the homicide. Appellant's shoes with socks in them were found in his barn, both being wet. There were other circumstances not necessary to mention introduced by the State to connect appellant with the homicide, and show that the killing was done by lying in wait. Appellant took the stand in his own behalf, admitting the killing, and sought to justify the act. His statement briefly and substantially may be summed up thus: That on the evening of the killing, about 5 o'clock, or thereabouts, his horses not having returned to his place, he went in search of them, carrying his double-barrel shotgun with him with some additional cartridges in his pocket; that some distance from home he found his horses, and was driving them home when he met deceased; that de-

ceased was going south and appellant going north; they were traveling different roads, which, at the point of meeting, were about forty to fifty feet apart; that deceased had threatened his life on various occasions. When he met deceased, deceased remarked to him, "John Canon, your time is now up," and that deceased jerked his pistol, and they both fired at the same time; that he fired a second shot. By these means appellant accounts for the three shots that were heard by the witnesses. That he went on home, penned his horses, placed his gun in a little barn or crib, and did not go in the house; that he went to attend to some work obligatory upon him as an employe of Mr. Carter, one of the mill owners. He accounts for his absence from home until 9 or 9:30 by showing that he did various things, unnecessary here to detail. That he reached home about 9 or 9:30, pulled off his shoes and socks, which were wet, it having been raining that evening, and placed them in his barn, which was his custom under such circumstances, because his wife objected to his carrying his dirty, wet shoes into the house. That he went to bed, and remained with his wife that night until 5 o'clock in the morning, when he arose, dressed himself, saddled his horse, and went out to where the tragedy had occurred the evening before to ascertain whether deceased was dead. Discovering the fact that he was dead, he prepared to remove the body; that the pistol of deceased was lying near him, which he picked up and threw in a nearby pond; that being a small man and physically unable to handle the body of deceased, as he intended, by putting him on the horse and carrying the body by that means, he tied a rope around the feet of deceased and dragged him to the place where the body was found, and sought to cover the body, which he only succeeded partially in doing; that he accounts for all these acts and this conduct on his part by reason of the fact that he was frightened, and especially afraid of the white people finding it out. The witnesses who testified to the sound of the shots swore they all sounded alike. In rebuttal the State introduced the written confession of appellant. The confession in the main is in the nature of a confession and avoidance, in which he asserts his case of self-defense, but states in that written confession that he was out there with a woman; he did not mention the fact that he was after his horses or driving them home. This is a sufficient statement of the case to review the questions.

1. Application to change the venue was made and overruled. There are fourteen bills of exception touching the question of change of venue. The first recites the fact that the court erred in overruling the application for change of venue when the undisputed evidence of the witnesses Kimball, McMillan, Laird and Caton shows that the Camden and Corrigan precincts were violently opposed to the defendant, and that in the Camden precinct containing eighty

voters, seventy-five of them had signed the petition addressed to the court as set up in said application. That by the witness Kimball it is shown that said petition could have been augmented 100 signatures in an hour's time in Livingston, the county site of Polk County, and because by the undisputed testimony of the witnesses Kimball, McMillan, Laird, Caton, Garvey, Stephenson and Chapman it is shown that the defendant could receive but one verdict in Polk County, which barred the possibility of an acquittal. This bill is signed with the following qualification by the court: "The above bill of exception is allowed only insofar as it shows that the court overruled the motion to change the venue of this case. Counsel's zeal in framing this bill has overmastered his sense of propriety and his conclusions as to what the evidence showed are greatly at variance with the court's idea." The remaining thirteen bills touching the application to change venue are reserved to the ruling of the court in regard to certain questions asked of the witnesses in regard to the application for change of venue, and answers or expected answers. We are of opinion that the matter of change of venue as presented by this record can not be considered. The statement of facts in regard to the change of venue is not made a part of any of the bills of exception, nor was the statement of facts included in a bill of exceptions; and we are further of opinion same can not be considered because of the fact that the bills of exception in regard to change of venue were filed out of term time. Article 621, White's Annotated Code of Criminal Procedure, reads as follows: "The order of the judge granting or refusing a change of venue shall not be revised upon appeal, unless the facts upon which the same was based are presented in a bill of exceptions prepared, signed, approved and filed at the term of the court at which such order was made." This statute has uniformly been held to be an exception to the general rule in regard to filing statement of facts and bills of exception after term time, as provided by statute. This statute was enacted for the purpose of applying to this particular question of practice, and is, therefore, not within the general statute which authorizes the filing of bills of exception and statement of facts after court has adjourned. The authorities in this State are uniform in holding that the ruling of the court in granting or refusing a change of venue will not be revised on appeal unless the facts on which the ruling is based are presented in bill of exceptions prepared, approved, and filed during the term of the court in which such order was made, and unless the bills of exception contain the evidence, the question will not be considered. Blackwell v. State, 29 Texas Crim. App., 194; Adams v. State, 35 Texas Crim. Rep., 285; Kutch v. State, 32 Texas Crim. Rep., 184; Smith v. State, 31 Texas Crim. Rep., 14; Miller v. State, 31 Texas Crim. Rep., 609; Jackson v. State, 30 Texas Crim. App., 664. These are sufficient authorities to show the uniform and harmonious ruling of the court in construing the statute quoted. For

the reasons indicated, the ruling of the court refusing the application for change of venue will not be considered, and it would, therefore, follow that the incidental matters in regard to asking questions reserved in the bills of exception and the answers thereto, or the refusal of the court to permit answers, will not be revised.

2. The 15th bill of exceptions recites that during the trial and after four jurors had been selected out of the first venire of 120 men, and that venire had been exhausted, and while these four jurors were in the box and sixty more men on the second venire had been summoned, and were in attendance upon the court, in the presence of the four selected jurors and in the presence of the second sixty veniremen, defendant was brought into court manacled, that is, his hands were bound together with iron and with what is known as handcuffs. Appellant presented his bill of exceptions to this matter, which was not allowed with the following qualification: "This bill is not allowed for the reason that it is not by any means a true bill. The court's attention was never called to the fact, if it be a fact, that the defendant was brought into court handcuffed before the four selected jurors, and the special veniremen, and certainly no exception was taken at the time. The matter was called to the attention of the court for the first time in the defendant's motion for new trial, and the testimony taken upon the hearing of the motion for new trial will show, first, how the matter occurred and all about it, and counsel when asked by the court upon the hearing of the motion for new trial, why he had not called the court's attention to the matter when he first discovered it, answered that he did not wish to make the matter conspicuous, or words to that effect, and wanted to save the point." As the bill is qualified, it eliminates the question from the case. This matter came too late in motion for new trial. However, we will state that the substance of the matter, as shown in regard to the motion for new trial, was about this way: The officer brought appellant into the courtroom, as he says, overlooking the fact that he had not taken the handcuffs from appellant; that immediately upon entering the courtroom he noticed that fact, and took him out of the courtroom immediately and took off his handcuffs, and brought him back into the courtroom. If we were to consider these matters, we are of opinion that same is not of sufficient importance under the circumstances stated to require a reversal of the judgment.

3. There were several bills of exception reserved to the manner of impaneling the jury. These bills were all reserved to the manner of questioning the jurors as to their location in the county and their bias and prejudice, and those who said they had a conclusion and the manner of forming the conclusion. The court qualifies these bills in such manner as to show his rulings were in accord with the decisions of this court, and that none of them were in fact prejudiced or had such a conclusion as would disqualify them. This might per-

haps be sufficient answer to these bills of exception, but none of the bills show what became of the jurors, further than that they were held qualified. None of the bills show that any of the jurors sat upon the trial or that appellant was required to exhaust a peremptory challenge upon them, nor that he challenged or offered to challenge them for cause further than as stated; nor is there any complaint in any of the bills that appellant was required to take an objectionable juror or that such a juror sat during the trial of the case. These bills do not show error.

4. Bill of exceptions No. 23 recites that the court admitted, over appellant's objection, the testimony of Henry Peebles as to the dragging of the body of deceased, except on the question of malice and showing the mind of the defendant, and the court should have limited that testimony to that extent, in his charge to the jury, which was requested of the court by defendant at the time of its admission, and the law governing that portion of the testimony was not given, to which defendant in open court excepted. In the first place, the evidence of Peebles is not stated in the bill of exceptions; nor, second, does it undertake to show what Peebles testified in regard to dragging the body of deceased. It was not, however, necessary for the court to limit the effect of this testimony.

5. Bills of exception No. 24 was reserved to the ruling of the court admitting in evidence a subpoena issued out of the District Court for the deceased as a witness in the cattle theft case against appellant. The indictment mentioned in bill of exceptions No. 25 was admitted over appellant's objection, showing that appellant was indicted for the theft of an animal from the possession and ownership of deceased. The court limited the effect of this evidence to the question of motive, as he states in the bill of exceptions, and this is sustained by the record. This evidence was admissible. Looking at the statement of facts, it is discovered that there is a great deal of testimony in regard to the threats and illwill of appellant towards deceased on account of the prosecution against him for the cattle theft, and it was relied on mainly by the State to show motive for the killing. We are of opinion that the court did not err in regard to these matters.

6. Bill of exceptions No. 26 recites that while the witness George Keys was on the stand, the State asked him: "How did the defendant appear to look to you?" Appellant objected, and asked that the witness be required to tell what the defendant did, and that he describe the expression of his face and any other thing that the defendant did and let the jury say how that appeared, and because such testimony as detailed by the witness was highly prejudicial to appellant and could serve no legitimate purpose. The court qualifies this bill as follows: "Allowed and ordered filed, with the remark that the purpose of this evidence was to show that the defendant was excited, and such fact was elicited by the question. There was

no other way to show it unless the question had been put in a leading shape or nearly so." The matter as presented is so indefinite, we are unable to understand how this could have injuriously affected appellant. It certainly is not apparent from the face of the bill reserved. If we should look to the evidence detailed by the witness Peebles, it is apparent that this testimony was admissible, and in fact this character of testimony, as we understand, is always admissible. The excited appearance of the party is difficult to detail before a jury. This is a shorthand rendering of the facts which, under the authorities, is clearly admissible.

7. The undershirt, top shirt and jumper worn by deceased at the time of the homicide, as well as the shoes worn by defendant, and the remnants of a flour sack, and two shells found not a great way from the place of the homicide, and some mutilated gun wads found also near the scene of the homicide, were all admitted in evidence over appellant's objection. The court explains this bill of exceptions by stating that this evidence was all adduced by the State in introducing its evidence in chief and before appellant had introduced any testimony. The record is very full in regard to these matters, and they were clearly admissible for the various purposes for which they were introduced. It is shown, for instance, with reference to the shells, that appellant bought the kind and character of shells found during the same month and prior to the homicide. This is not only proved by the State, but admitted by appellant while upon the stand as a witness. Deceased a few moments before the homicide had bought a sack of flour and was carrying it home, and when last seen before the homicide had it upon his shoulder. One of the gun wads spoken of as well as a shot, corresponding with shot in shells bought by appellant, were sifted from the flour that was in the sack supposed to have been carried by deceased, and which the State reasonably did show to have been the same sack of flour. The wounds on the body of deceased corresponded with a shot hole or two that were found in the flour sack. The clothing introduced in evidence was worn by deceased at the time of the killing, and was introduced in connection with evidence in regard to the wound to show or explain the position of the parties as far as could be by these means at the time of the homicide. We are of opinion that it was important testimony in the case, and explanatory of the condition of the parties and their relative positions to each other at the time deceased received the wounds which proved to be fatal.

8. Bill of exceptions No. 33 recites that Charley Barnes testified that witness' house was in a direct line between the residence of W. T. Carter and the home of the defendant, and the evidence had shown that the deceased had visited the witness' house on this particular night, and that when the deceased left the witness' house that he picked up a shotgun from the gallery and that afterwards came by, and it was then that the following matters came up: "Q.

When he picked up his gun where did he 'go? A. I could not say; he said that he was going home. Q. He went out of your house? A. Yes, sir. Q. Did you see the defendant that night? A. About ten minutes after, I guess. Q. Did he come from the front? A. Yes, sir. Q. About how long after? A. He told me that he came from Mr. Will Carter's." The State objected to what the defendant stated. The court rejected it for various reasons urged by the State, and informed appellant that he could not prove these matters either before or after the homicide. Appellant remarked, "Save us a bill on that, Your Honor." "Q. Did you say to the defendant that Warren Perryman had left there with a gun? A. After he asked me, I told him that he had one. I told him yes." The State here objected again, and the court sustained the objection. "Did you state to the defendant that Warren Perryman left there with a gun? A. After he asked me I told him that he had one. I told him yes." The State objected again to what defendant said, and the court sustained the objection. This is a sufficient statement of this bill. There are other questions along this line, the effect of which was appellant was seeking to prove that after deceased left witness' houses, that appellant came there and had a conversation with witness with reference to deceased coming to witness' house with a gun and leaving there with it, and the impression made upon the witness' mind in regard to these matters. The court signed the bill with the following statement: "I can not approve this bill in the shape it is in. In fact, all that Barnes said he saw and what he told defendant, you will find in the statement of facts." There was quite a lot of testimony in regard to this and kindred matters introduced on the trial, which went before the jury. There was quite a lot of the record filled with questions and answers and objections and rulings of the court in regard to this particular matter, appellant seeking to get it before the jury, and the State succeeded in keeping it out under the rulings of the court. Finally, however, the whole matter went before the jury for their consideration.

9. The same may be said about bill of exception No. 34 in regard to some matters appellant sought to introduce through the witness Cayton in regard to appellant's relations to the Carter home and his employment by Mr. Carter. The court signs this bill with the statement that, "All of the facts mentioned which counsel stated he could have proven, were absolutely established by several witnesses independent of the defendant at first. The court's main reason for excluding a portion of the testimony was that counsel for defendant was attempting to prove that defendant was the trusted servant of Mr. W. T. Carter, and to add to what he had already gotten before the jury, and afterward, too, that defendant was a 'white man's nigger.' But all of this testimony was gotten before the jury and was undisputed in any way." As this and the previous bill are explained by the court, and as shown by the statement of facts referred to by the court, we are of opinion there is no reason why the matter should

form the basis of a reversal. Bill of exceptions No. 35 relates to the same matter as the two previous bills.

10. Bill of exceptions No. 36 recites that the State, over appellant's objection, was permitted to prove by several witnesses, the reputation of deceased for peace and quietude and as a law abiding citizen, none of which he says had been put in issue by himself. The court signs the bill with the remark that "the defendant had established threats by deceased against defendant's life, and the evidence was admissible under several rulings of our Court of Criminal Appeals." This testimony was clearly admissible under this statement of the court. As shown by the statement of facts, appellant introduced evidence to the effect that deceased had made threats against his life, not only by his testimony, but by witnesses who had communicated the fact to him that deceased had made the threats to take his life. This testimony was clearly admissible under the decisions of this court, as article 713 of the Penal Code has been construed by the court. Jirou v. State, 53 Texas Crim. Rep., 18; Shelton v. State, 54 Texas Crim. Rep., 588; Smith v. State, 55 Texas Crim. Rep., 628; Menefee v. State, 50 Texas Crim. Rep., 249; Rhea v. State, 37 Texas Crim. Rep., 138.

11. Bill of exceptions No. 37 was reserved to the action of the court permitting the written voluntary statement of defendant to be introduced in evidence. This written confession was made while appellant was in jail. The objection was that same does not appear to have been a voluntary statement of the defendant. The written statement or confession is not embodied in the bill of exceptions, but we are of opinion by referring to it as contained in the statement of facts that on its face it does appear to have been a voluntary statement of defendant. The court qualifies the bill with the remark that "the testimony was uncontroverted; that the statement was the voluntary statement made by accused and after being properly warned that it might be used against him." There was no error, therefore, in this ruling of the court.

12. Bill of exceptions No. 39 was reserved to the introduction of the clothing alleged to have been worn by deceased, a top shirt, undershirt, pair of shoes, two loaded shells, some gun wads, some pieces of rags alleged to have been parts of a flour sack, all of which, he says, were inadmissible for any purpose, except possibly the top and undershirt, and they only for the purpose of locating the wounds on the body, and that at the time these articles were admitted in evidence the court promised to limit the purpose of their introduction in his charge, which the court did not do. The court makes this statement: "Not allowed for the reason the court has already allowed bill of exceptions embracing in substance same thing." It is unnecessary to review this matter. We are of opinion these matters were properly introduced.

13. Bill of exceptions No. 38 is reserved to the failure of the court to charge upon the question of manslaughter. A sufficient statement,

we think, of the evidence has already been made bearing upon the merits of the case in regard to the immediate facts, and acts of the parties, and the surroundings of the homicide. Under the case as made by the testimony from both sides, there were two issues presented, murder on one side, and self-defense on the other. The court gave an ample charge in regard to murder in both degrees as well as in regard to self-defense, and also charged the law applicable to threats. This case is very much like the case of Jirou v. State, 53 Texas Crim. Rep., 18, which case has been approved in other cases. We are of opinion that the question of manslaughter is not in the case. Appellant makes a clear case of self-defense. The State makes a case of waylaying with antecedent preparations, former grudges and all indications and indicia of murder. If the State's evidence is to be credited, and the jury did believe it, it was a killing upon preparation and lying in wait. The evidence for appellant shows that he met his antagonist unexpectedly, and was informed by him his day of living was ended; that his time was up, and that deceased immediately drew his pistol and fired. We do not believe there are any facts which required the court to charge on manslaughter under this state of case. If appellant's testimony is to be credited, he had a case of self-defense, and the jury, believing his testimony, should have acquitted.

We have reviewed the questions as we understand them as presented by appellant's bills of exception and motion for new trial, except the refusal of the court to give some special requested instructions. These requested instructions pointed out and specified some particular facts upon which the court was asked to charge the jury, mainly bearing upon the issue of self-defense. The court is not required to single out particular facts and charge the jury with reference to them, as an ordinary rule, and this case does not present an exception to that rule. The matters mentioned by appellant in his requested instructions are not such as required the court to charge the jury upon same. The court's charge, we think, amply and fully protected appellant's legal rights upon the issue of self-defense.

As the record is presented to this court, we find no such error as requires a reversal of the judgment. The judgment is therefore affirmed.

*Affirmed.*

[Rehearing denied May 18, 1910.—Reporter.]